**AFFIRM; and Opinion Filed July 23, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-01243-CR

**JUBELL LOMBRANA, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 195th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F17-51375-N**

# MEMORANDUM OPINION

Before Justices Francis, Fillmore, and Whitehill
Opinion by Justice Fillmore

A jury found Jubell Lombrana guilty of stalking, *see* TEX. PENAL CODE ANN. § 42.072 (West 2016), and the trial court assessed punishment of two years' imprisonment. In two issues, Lombrana asserts the evidence is insufficient to support the judgment and the trial court erred by "bestowing its imprimatur upon the State's wholly objectionable and legally improper jury argument." We affirm the trial court's judgment.

## Background

Lombrana and Marilu Orozco met at work and dated for approximately one year. Orozco testified that, after she terminated the relationship, Lombrana, who was no longer employed at the same place, began showing up at her workplace. According to Orozco, Lombrana was at her workplace "every single day" at 4:30 a.m. when she arrived at work and at 10:45 a.m. when she

took her lunch break. He would also ask a friend who still worked with Orozco what time Orozco got off work. Lombrana left "gifts" for Orozco at work, including juice, "little bags of cream," and cards. On one of the cards was a handwritten note that, according to Orozco, said she "had the devil inside" her.[1] Orozco believed Lombrana came to her workplace in order to get her into a "bad situation" with her coworkers.

One of Orozco's supervisors told her that Lombrana had sent him photographs obtained from Orozco's Facebook page. Orozco also heard that Lombrana sent photographs of people having sex to her supervisors and told her supervisors the pictures were of him and Orozco. Orozco testified she was embarrassed, angry, and sad about Lombrana's conduct and that the conduct hurt her reputation at work. Orozco contacted the Carrollton Police Department on multiple occasions about Lombrana's conduct.

According to Orozco, Lombrana would "hide" in the apartments near her house to watch for her and would follow her. In late October 2016, Orozco saw Lombrana at a Walmart store. According to Orozco, she felt a lot of anger and fear when she saw Lombrana. She told him to leave her alone and that she was going to report his conduct to the police. Lombrana responded that he had already been to the police and "they said that what he was doing was okay." Orozco reported to a police officer at the Walmart store that Lombrana was following her. Orozco later saw Lombrana again and stopped at a library to allow him to pass.

In December 2016, Orozco reported to the police that Lombrana was taking pictures of her house. Orozco believed Lombrana intended to use the pictures to report her to the City of Dallas for code violations.

On December 26, 2016, Orozco left her house to pick up her daughter and saw Lombrana following her. Orozco stopped so that Lombrana would pass her, but he turned around and began

---

[1] The note was written in Spanish.

following her again. Orozco testified that, because Lombrana had been following her so often, she was in fear he might harm her physically. Orozco drove to a police station and reported that Lombrana was following her.

Orozco spoke to Officer James Perry. Officer Perry described Orozco as nervous, but not "trembling" during their conversation. Officer Perry clarified that he could tell "it was making her upset" that Lombrana was in the parking lot of the police station and that Orozco was nervous "something might happen." However, he did not believe Orozco was "in fear for her life." He admitted that, due to the language barrier, he might not have understood the seriousness of the situation.

Officer Perry went out to the parking lot where Lombrana was parked and asked him why he was at the police station. Lombrana said he had come to use the restroom. Officer Perry found the response "kind of odd." Officer Perry told Lombrana that Orozco said he was following her and, if that was true, it could be a crime. He warned Lombrana that it was very clear Orozco did not want to have any contact with him and instructed Lombrana to leave the police station. Because Officer Perry decided there was insufficient evidence at the time for charging Lombrana with an offense, he wrote a report classifying Lombrana's conduct as a "preliminary offense for harassment." Orozco testified that, after she left the police station, she saw Lombrana again. Orozco picked up her daughter and the two stopped at a convenience store. When they came out of the store, they found a card that Lombrana had left under the windshield wipers of Orozco's car.

In early January 2017, Orozco went to a Fiesta Supermarket. When she came out, Lombrana was parked next to her car. He followed her to her house, stopped, and again took pictures of her house. Orozco called the police about Lombrana's conduct.

Orozco testified that, on January 6, 2017, she came home from work and saw Lombrana. Orozco's daughter, who is mentally disabled, got out of the car to open the gate. Lombrana stopped in front of Orozco's vehicle and said Orozco's name twice. Because her daughter had not yet opened the gate, Orozco drove around the block. At an intersection, Lombrana stopped in front of Orozco, called her a "wetback," told her to dye her hair because she looked ugly, and said she had ugly teeth. Lombrana's comments made Orozco angry. However, she testified she was also becoming more and more afraid of Lombrana, his conduct was alarming her, and she felt he was harassing her. Although Lombrana had "never put his hands" on her, Orozco was afraid "given all these incidents" that he might hit her or get physical.

Orozco grabbed pepper spray from her purse and attempted to spray Lombrana. However, it sprayed her and her vehicle, and she did not know if any of the spray got on Lombrana. When Lombrana moved his vehicle, Orozco tried to pass quickly. Lombrana then stopped in an attempt to make Orozco run into the back of his car. Orozco drove to a convenience store and called the police. When the police did not arrive at the convenience store, Orozco went home.

The next day, January 7, 2017, Lombrana again took photographs of Orozco's house. Orozco was alarmed because she did not know why Lombrana was taking the photographs. Orozco reported Lombrana's conduct to the police.

According to Orozco, on January 14, 2017, Lombrana parked in front of her house and was playing music "really loudly." Orozco's son hit Lombrana's truck with a baseball bat because he knew Orozco was "having problems" with Lombrana. Both Lombrana and Orozco called the police. Officers Joshua Lewis and Beverly Ma responded to the two calls and found Lombrana about two blocks from Orozco's house. While they were talking to Lombrana, Orozco and her son came across the street, "panicked and distressed," saying Lombrana would not leave Orozco alone. In Officer Lewis's opinion, Orozco was afraid of Lombrana.

Officer Lewis spoke to Lombrana while Officer Ma spoke to Orozco. Officer Lewis testified that Lombrana said he had dropped off a woman he was dating who lived down the street from Orozco and was parked at the stop sign in front of Orozco's house when Orozco's son came out and hit his car with a stick. Lombrana claimed that Orozco was angry with him for dating the woman. Officer Lewis asked Lombrana why, since he knew of the conflict with Orozco, he could not have chosen another route. Lombrana responded that it was a public street, he could go anywhere he wanted, and his mechanic lived in the area. Officer Lewis asked Lombrana if they could verify his statement with the woman he had dropped off, and Lombrana responded that she had left with someone else to go the store and he could not get in contact with her. Officer Lewis testified he could not get verification on who the woman was or if she even existed.

Officer Lewis asked Lombrana about his relationship with Orozco. Lombrana said they had been engaged to be married and, for no reason, she decided she did not want to be in a relationship with him anymore. Lombrana said he had never loved a woman the way he loved Orozco and he did not understand why she "called it off." Lombrana stated he just had to accept that and he was "moving on" and did not want any issues with Orozco. In Officer Lewis's opinion, it did not sound like Lombrana was "moving on."

When Officer Lewis looked inside Lombrana's car, he saw it was full of clothes and other objects. Because the front seat was completely full, Officer Lewis asked Lombrana where the woman he dropped off had been sitting. Lombrana said she had sat in the front seat, and he had moved everything into the front seat after she got out of the car. Officer Lewis did not find Lombrana's statement credible and testified that, in his opinion, it looked like Lombrana had been living in the car. There were a lot of wrappers for peanut mix and trail mix and empty bottles of water. It was Lewis's impression that somebody had been sitting in the vehicle for a long period of time.

According to Officer Ma, Orozco was "scared and terrified" of Lombrana. Because Officer Ma does not speak Spanish, Orozco's daughter acted as an interpreter. Due to the daughter's mental disability, it was possible that some information was "lost in translation." After confirming that Orozco had previously called the police about Lombrana's conduct, Officer Ma made the decision to arrest Lombrana. Officer Lewis testified that one of the reasons Lombrana was arrested was because they "honestly felt like that she was in danger." After Lombrana was arrested, Officer Lewis conducted an inventory search of his car. Inside the center console, Lombrana found a bottle of prescription medication that had Orozco's name on it and a birthday card addressed to Orozco.

Detective Abel Lopez interviewed Orozco after Lombrana was arrested. Detective Lopez testified Orozco gave him some business cards and a booklet of Bible verses that Lombrana had left for her. Detective Lopez confirmed Orozco contacted the Carrollton Police Department three times and the Dallas Police Department eight times about Lombrana's behavior. He did not, however, "pull" the two 911 calls from the January 14th incident, did not look at Lombrana's car, and did not interview any other witnesses. According to Detective Lopez, he was "looking at the big picture" and could "determine a pattern based on the calls that had come in."

Although at the time of trial Orozco had not had contact with Lombrana for "many months," she testified she was still afraid of him. Orozco agreed that the only thing that would relieve her fear of Lombrana was "if he wasn't alive."

**Sufficiency of the Evidence**

As charged in this case, a person commits the offense of stalking if he, on one or more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, (1) knowingly engaged in conduct that constitutes an offense under section 42.07

of the penal code,[2] (2) that caused the other person to be placed in fear of bodily injury or death, and (3) that would cause a reasonable person to fear bodily injury or death. *See* TEX. PENAL CODE ANN. § 42.072(a). The indictment charged Lombrana with stalking based on following Orozco on December 26, 2016, and taking photographs of her house on January 7, 2017. Lombrana argues the evidence is insufficient to support the conviction because the charged conduct would not have placed an objectively reasonable person in fear of bodily injury or death.

We view the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *Fernandez v. State*, 479 S.W.3d 835, 837 (Tex. Crim. App. 2016). We examine all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Zuniga v. State*, No. PD-0174-17, 2018 WL 2711145, at *2 (Tex. Crim. App. June 6, 2018). This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Nisbett v. State*, No. PD-0041-17, 2018 WL 3134030, at *14 (Tex. Crim. App. June 27, 2018). The factfinder is entitled to judge the credibility of the witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Zuniga*, 2018 WL 2711145, at *2.

We defer to the factfinder's determinations of credibility and may not substitute our judgment for that of the factfinder. *Jackson*, 443 U.S. at 319; *see also Nisbett*, 2018 WL 3134030, at *14 ("An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence."). When there is conflicting evidence, we must presume the factfinder resolved the

---

[2] As relevant to this case, a person commits an offense under section 42.07 of the penal code if, with intent to harass, annoy, alarm, abuse, torment, or embarrass another person, the person threatens, in a manner reasonably likely to alarm the person receiving the threat, to inflict bodily injury on the person or to commit a felony against the person. TEX. PENAL CODE ANN. § 42.07(a)(2) (West Supp. 2017)

conflict in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326; *Zuniga*, 2018 WL 2711145, at *2. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and, alone, can be sufficient to establish guilt. *Nisbett*, 2018 WL 3134030, at *14. "Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction." *Id.*

Lombrana argues there is insufficient evidence a reasonable person would have feared bodily injury or death from his acts of photographing Orozco's house or following her. However, "[i]n a prosecution for stalking, each party may offer testimony as to all relevant facts and circumstances that would aid the trier of fact in determining whether the actor's conduct would cause a reasonable person to experience a fear" of bodily injury or death. TEX. CODE CRIM. PROC. ANN. art. 38.46 (West Supp. 2017).[3] Evidence of incidents that occurred before the date alleged in the indictment are relevant to prove the defendant's conduct would cause a reasonable person to fear bodily injury or death. *See e.g., McGowan v.* State, 375 S.W.3d 585, 589–90 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). Accordingly, in considering whether the evidence is sufficient to support the conviction, we are not restricted to considering only Lombrana's acts of following Orozco on December 26, 2016, and photographing her house on January 7, 2017.

A reasonable person can be placed in fear of bodily injury or death based on a defendant's "pattern of behavior," such as leaving numerous phone messages, appearing several times at places where the defendant knows the person would be, and engaging in conduct that the defendant knows would frighten the person. *See Clements v. State*, 19 S.W.3d 442, 449 (Tex. App.—Houston [1st Dist.] 2000, no pet.). No overt threat of violence is required to place a reasonable person in fear. *See e.g., Williams v. State*, 827 S.W.2d 614, 616 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd)

---

[3] *See also Molett v. State*, No. 05-08-00728-CR, 2009 WL 824761, at *5 (Tex. App.—Dallas Mar. 31, 2009, pet. ref'd) (mem. op., not designated for publication) ("The stalking offense contemplates the presentation of evidence that covers the entire course of a defendant's alleged unlawful conduct directed specifically towards a complainant.").

(concluding party could be "placed in fear" under section 29.02 of penal code even if "no actual threats were conveyed by the accused").

Viewing all the circumstances surrounding the charged conduct, the evidence showed that, after Orozco ended her relationship with Lombrana, he began appearing at her workplace, leaving her unwanted cards and gifts, sending photographs to her supervisors, following her, and taking pictures of her house. Orozco reported Lombrana's conduct to the police on eleven different occasions. Although Orozco told Lombrana to leave her alone and Officer Perry told Lombrana that he could be committing a crime by following Orozco, Lombrana continued to follow her. After Orozco came home from work one day to find Lombrana at her house, they got into confrontation during which Lombrana blocked Orozco's vehicle and made derogatory comments to her. On January 14, 2017, when Lombrana was arrested, Officer Lewis found prescription medication with Orozco's name on it and a birthday card addressed to Orozco in Lombrana's car. In Officer Lewis's opinion, it did not sound as if Lombrana was "moving on" from his relationship with Orozco and it looked as if Lombrana was "living out" of his car. According to Officer Perry, Orozco was "nervous" about Lombrana following her to the police station. Officers Ma and Lewis testified that Orozco was afraid of Lombrana, and Officer Lewis testified they believed Orozco was in danger. Although Orozco admitted Lombrana never physically threatened her, she also testified he spoke "aggressively" to her and she was afraid of him due to "all the incidents."

Considering the frequency, content, unsolicited nature, and pattern of Lombrana's behavior, as well as his display of at least some anger directed toward Orozco, we conclude a rational juror could have found that Lombrana's conduct in following Orozco and photographing her house would place an objectively reasonable person in fear of bodily injury or death. *See*

*Ploeger v. State*, 189 S.W.3d 799, 811 (Tex. App.—Houston [1st Dist.] 2006, no pet.).[4] We resolve Lombrana's first issue against him.

## Jury Argument

In his second issue, Lombrana contends the trial court erred by "bestowing its imprimatur upon the State's wholly objectionable and legally improper jury argument." Lombrana substantively argues the trial court erred by overruling his objection that, during closing argument, the prosecutor improperly struck at Lombrana over the shoulders of defense counsel.

During the State's initial closing argument, the prosecutor argued the jurors could use their common sense in evaluating whether the State proved all elements of the charged offense. The prosecutor specifically pointed to the eleven times Orozco called the police about Lombrana's conduct and Lombrana following Orozco on multiple occasions, taking her medication, and "waiting in his car." The prosecutor urged the jurors "to use common inferences that [they could] make from all the evidence that's been presented" and, considering all the evidence, Lombrana was guilty of stalking.

Lombrana's counsel pointed out the State's case was largely based on Orozco's testimony and the jurors were required to decide if they believed her "to the extent that you're willing to convict this man of a third-degree felony." Lombrana's counsel argued the State failed to talk to certain witnesses, take photos, record interviews, obtain written statements, or review the 911 calls from January 14, 2017. Lombrana's counsel contended that, although the evidence demonstrated Orozco was angry and felt harassed, it did not prove she was truly afraid.

Lombrana's counsel continued:

So as much as we might feel sorry for Ms. Orozco, do we believe that each and every one of these incidents happened, just based on her word? Do we believe her

---

[4] *See also Teague v. State*, No. 06-14-00053-CR, 2015 WL 2236642, at *12 (Tex. App.—Texarkana May 13, 2015, pet. dism'd) (mem. op., not designated for publication) ("Considering Teague's pattern of behaviors, even after being repeatedly warned not to engage in such behavior, the jury could have easily and justifiably found that a reasonable person would have been placed in fear of bodily injury or death.").

to that extent that she's a hundred percent credible, that there's no doubt in anything that she said, none of the things that I've just talked about, such that we're going to take this man's liberty, label him a felon and a stalker?

Lombrana's counsel argued that Orozco did not know that Lombrana actually took pictures of her house or hid outside waiting for her. She urged the jury not to speculate or "fill in these blanks." Lombrana's counsel concluded, "Mr. Lombrana's freedom and his reputation are in your hands. Follow the law. Find him not guilty."

On rebuttal, the prosecutor argued she did not want the jurors to speculate, but wanted them to use their common sense. The prosecutor asserted Orozco had no reason to lie about Lombrana's conduct and Lombrana's conduct would terrify a reasonable person. She then argued that, even if the detective had done more in the underlying investigation, it would not have changed Orozco's testimony.

The prosecutor asserted:

Defense wants you to feel bad for labeling him a stalker. Ladies and gentlemen, that's wrong to put on your shoulders. That's not something that you're doing. That's something that he did to himself. That's not on you anymore.

Lombrana did not object to the argument.

The prosecutor then argued Lombrana was guilty of stalking and the jury could not consider anything other than the facts in the case. The prosecutor then concluded:

Ladies and gentlemen, it's a serious case no doubt. It is not something you're doing, you're doing wrong by coming back with a guilty verdict. There's no reason the defense counsel should guilt you into that.

The trial court overruled Lombrana's objection the State was striking at Lombrana over the shoulders of his counsel.

To preserve error for appellate review, a party must object when improper argument is made and obtain a ruling on that objection. TEX. R. APP. P. 33.1(a); *Mathis v. State*, 67 S.W.3d 918, 926–27 (Tex. Crim. App. 2002); *Johnson v. State*, 233 S.W.3d 109, 114 (Tex. App.—Houston

–11–

[14th Dist.] 2007, no pet.). The objection must be made at the earliest possible opportunity. *Espinosa v. State*, 194 S.W.3d 703, 708 (Tex. App.—Houston [14th Dist.] 2006, no pet.). Further, an objection must be lodged each time the allegedly improper argument is made. *Temple v. State*, 342 S.W.3d 572, 603 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013); *Briones v. State*, 12 S.W.3d 126, 129 (Tex. App.—Fort Worth 1999, no pet.).[5] Failure to object to jury argument at trial forfeits the right to raise the issue on appeal. *Simpson v. State*, 119 S.W.3d 262, 268 (Tex. Crim. App. 2003).

Lombrana objected when the State argued defense counsel was trying to "guilt" the jury into returning a not guilty verdict. He, however, did not object to the similar argument made earlier by the State that the defense wanted the jury to "feel bad" about returning a guilty verdict and that it was "wrong to put [that] on your shoulders." Because Lombrana did not lodge an objection each time this allegedly improper argument was made, he failed to preserve this issue for our review. *See Briones*, 12 S.W.3d at 129 (concluding defendant failed to preserve any error in prosecutor's allegedly improper argument because defendant did not object when prosecutor made other comments to same effect).[6] We resolve Lombrana's second issue against him.

We affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.1

171243F.U05

---

[5] *See also Carter v. State*, No. 05-15-01213-CR, 2017 WL 655925, at *3 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op., not designated for publication).

[6] *See also Chavezcasarrubias v. State*, No. 02-14-00418-CR, 2015 WL 6081502, at *4–5 (Tex. App.—Fort Worth Oct. 15, 2015, no pet.) (mem. op., not designated for publication)



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

JUBELL LOMBRANA, Appellant

No. 05-17-01243-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 195th Judicial District Court, Dallas County, Texas,
Trial Court Cause No. F17-51375-N.
Opinion delivered by Justice Fillmore,
Justices Francis and Whitehill participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 23rd day of July, 2018.